# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 25, 2012

## STATE OF TENNESSEE v. STEVEN O. HUGHES-MABRY

**Appeal from the Circuit Court for Sullivan County**
**No. S54919    R. Jerry Beck, Judge**

**No. E2011-02255-CCA-R3-CD Filed May 16, 2013**

The Defendant, Steven O. Hughes-Mabry, was convicted by a Sullivan County jury of possession of .5 grams or more of cocaine with intent to sell or deliver within 1000 feet of a school zone, introduction of contraband into a penal institution, and driving on a suspended license. He was sentenced to concurrent terms of fifteen years, three years, and six months, respectively. In this direct appeal, the Defendant challenges (1) the denial of his motion to suppress, arguing that the officers lacked reasonable suspicion for an investigatory stop; (2) the sufficiency of the evidence establishing that the possession offense occurred within 1000 feet of a school zone; and (3) the trial court's refusal to impose sanctions against the State for failing to preserve the identity of a witness. After a thorough review of the record and the applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Paul A. Harr, Blountville, Tennessee, for the appellant, Steven O. Hughes-Mabry.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises from two undercover officers conducting surveillance at a gas station in Kingsport on October 30, 2007. On April 9, 2008, a Sullivan County grand jury indicted the Defendant for possession of .5 grams or more of cocaine with intent to sell or deliver

within 1000 feet of a school zone, a Class A felony; introduction of contraband into a penal institution, a Class C felony; and driving on a suspended license, a Class B misdemeanor. See Tenn. Code Ann. §§ 39-16-201, 39-17-417, 39-17-432, 55-50-504.

Thereafter, the Defendant filed a motion to suppress "all evidence obtained, arising from, and incident to the stop, arrest and search conducted by agents of the Kingsport Police Department and/or the Sullivan County Sheriff's Department." As grounds for suppression, the Defendant argued that he "did not engage in a consensual encounter with law enforcement officials, nor was there a reasonable basis or probable cause for an investigatory stop or probable cause for a seizure." Following the denial of the Defendant's motion, the case proceeded to trial.

The evidence presented at trial revealed the following facts. Officers Steve Summey and Tim Crawford of the Kingsport Police Department were at the Sunoco gas station around 9:00 p.m. on October 30, 2007. The gas station was located on Lynn Garden Drive, which, in 2007, was in the vicinity of Tri-Cities Christian Elementary School.

The two officers were wearing "plain clothes" and were sitting in an unmarked police car, which was parked facing the front of the store "on the far right parking space." While they were observing the area, a gray Pontiac Grand Am entered the gas station parking lot and parked on the south side of the building, which was "directly in front of" their police car. The driver of that vehicle, a white male, exited the car and stood beside it for a short while. He then opened the car's hood, but never looked inside at the engine compartment. Neither officer observed any mechanical problems with the vehicle when it entered the gas station parking lot.

Officer Summey opined that the man appeared to be "waiting for someone," looking in the direction of the "other parking spaces." Thereafter, a purple BMW, driven by the Defendant, entered the gas station's parking lot and parked in front of the station, next to the unmarked police car. Both officers testified that, after the Defendant exited his vehicle, he made eye contact with the driver of the Grand Am. The two men then proceeded inside the store together.

Sgt. Crawford followed the men inside the gas station. At some point, Sgt. Crawford witnessed the two men having a conversation in the back of the store. According to Sgt. Crawford, both men glanced at him and then separated. Sgt. Crawford thereafter returned to his vehicle and told Officer Summey that he believed a drug deal was about to take place. As Sgt. Crawford was heading back inside the store, the two men exited the gas station. It did not appear to the officers that either man had made a purchase while inside the store. Officer Summey confronted the white male, and Sgt. Crawford stopped the Defendant.

-2-

Officer Summey testified that he identified himself as a police officer to the white male and requested consent to search his person. According to Officer Summey, the white male "was very nervous" and "shaking," looking "toward the direction of [the Defendant]." After obtaining consent from the white male, a search of his person did not reveal any drugs, only some cash in "one pocket" and a twenty-dollar bill in the pocket of his jacket. Officer Summey explained that keeping money in separate pockets was indicative of a drug transaction; according to Officer Summey, a person about to purchase drugs engages in this behavior to keep their money separate and not "draw attention to all their money." Officer Summey, having no further cause to detain this individual at that time, released him and went to assist Sgt. Crawford with the Defendant. According to Officer Summey, his encounter with the white male was "very quick," lasting "[a] minute or less."

In the meantime, Sgt. Crawford had likewise approached the Defendant and identified himself as a police officer. He asked to speak with the Defendant, and Sgt. Crawford maintained that the ensuing conversation was consensual. Sgt. Crawford asked the Defendant if had any identification, but the Defendant was unable to produce a driver's license. The Defendant gave Sgt. Crawford his personal information and told Sgt. Crawford that he lived in Michigan. The Defendant further informed Sgt. Crawford that he had lost his driver's license, so Sgt. Crawford attempted to confirm through dispatch whether the Defendant had a valid license. According to Sgt. Crawford, the Defendant became "increasingly nervous" and "real fidgety." Believing that the Defendant was going to run, Sgt. Crawford handcuffed the Defendant "temporarily until [they] determined what his license status was."

A records check in both Michigan and Tennessee revealed no valid license for the Defendant. The Defendant then told Sgt. Crawford that, although he lived in Michigan, he had a Georgia driver's license. Dispatch confirmed that the Defendant's Georgia license was suspended. At that time, Sgt. Crawford advised the Defendant that he was under arrest for driving on a suspended license, but did not inform the Defendant of his Miranda rights. At trial, the parties stipulated that the Defendant's license was in fact suspended.

Officer Summey informed the Defendant that he was going to be transported to the county jail. The officers attempted to search the Defendant's person there at the gas station, but the Defendant refused to spread his legs. Officer Summey asked the Defendant if he had drugs hidden on his person, and the Defendant replied that he did not. Officer Summey explained to the Defendant that if he brought drugs or weapons into the jail, he could face additional charges.

Once inside the jail, a more thorough search of the Defendant's person was conducted. Thirty-two "rocks" were found in the Defendant's buttocks and one "rock" was found in the

-3-

brim of the Defendant's hat. The thirty-two "rocks" were all individually packaged. Officer Summey opined that the "rock" found in the Defendant's hat was easily accessible to the Defendant and worth approximately twenty dollars. Several of the "rocks" were later tested by the Tennessee Bureau of Investigation, revealing .12 grams of cocaine in the package in the Defendant's hat and .62 grams of cocaine in four of the thirty-two "rocks" from the Defendant's buttocks. Based on the established weight, it was determined that further testing of the remaining "rocks" was not needed.

Also, the Defendant was interviewed once in custody. After receiving Miranda warnings, the Defendant confessed to selling drugs.

Following the presentation of proof, the jury found the Defendant guilty as charged. A sentencing hearing was held, and the trial sentenced the Defendant as a Range I, standard offender to fifteen years at 100 percent for the cocaine possession in a school zone conviction; three years for the introduction of contraband into a penal institution conviction; and six months for the driving on a suspended license conviction. The court ordered concurrent service of all three sentences, resulting in an effective fifteen-year sentence in the Department of Correction. This appeal followed.

ANALYSIS

On appeal, the Defendant challenges (1) the denial of his motion to suppress, arguing that the officers lacked reasonable suspicion for an investigatory stop; (2) the sufficiency of the evidence establishing that the possession offense occurred within 1000 feet of a school zone; and (3) the trial court's refusal to impose sanctions against the State for failing to preserve the identity of a witness.[1] We address each in turn.

*I. Motion to Suppress*

When the parties first briefed the suppression issue, the appellate record did not include an order from the trial court denying the motion to suppress or a transcript from the hearing.[2] This court, sua sponte, ordered the record on appeal to be supplemented with a transcript of the motion to suppress hearing and any written order on the motion, if one was

---

[1] For the purpose of clarity, we have reordered and combined several of the issues as presented by the Defendant in his brief.

[2] Originally, the State contended that, because the appellate record was incomplete, the Defendant had waived appellate review of the issue. The State went on to argue that, waiver notwithstanding, the trial court properly denied the Defendant's motion to suppress.

entered. Once the record was supplemented, we allowed the parties time to rebrief the issue addressing arguments raised by the evidence presented in the transcript.[3]

In his initial brief, the Defendant argued that his suppression motion was improperly denied, specifically that the evidence "was obtained without a reasonable suspicion for an investigatory stop and therefore without probable cause for a search" in violation of his Fourth Amendment rights. In his supplemental brief, the Defendant frames the issue as "[t]he trial court erred in denying the Defendant's motion to suppress because the officer[']s actions were not within a community caretaker function and there was not a consensual conversation. The officers lacked a sufficient basis for an investigatory stop of the Defendant." The State again submits that the trial court properly denied the Defendant's motion to suppress "because the arresting officer developed probable cause to arrest the Defendant after he engaged him in a consensual conversation."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999).

Here, the trial court determined the initial conversation was consensual. On this point, the trial court made the following findings of fact and conclusions of law:

> The officers see the Defendant . . . pull into the parking lot from a public road. It was either Lynn Garden Drive or Walker Street. It's on the corner. Automobile winds up there. So the officers saw a misdemeanor — eventually determined to be a misdemeanor committed in their presence. . . .

---

[3] The trial court ruled orally from the bench; thus, it appears that no written order of denial was ever entered, as none was transmitted to this court in accordance with our order.

The officers see other activity going on which would be consistent with a potential crime being committed. May not be. Certainly wouldn't arise to probable cause.

But anyway, the officers see this. And one of the officers, as the Defendant leaves the store, just says, "Can I talk to you?" Question, "Can I talk to you?"

And his recollection is, Defendant: "Oh, sure."

And the officer asked, "Do you have a driver's license?" I guess he could have easily said, "Do you have identification?"

Fellow says, "No. I'm from Michigan," or something of that nature. Later, after they'd talked, the officer evidently did some kind of . . .

At that point he might have been detained. I don't know. I doubt it, from what I've heard. The . . .

But in any case, the police officer found out he's from Georgia. He's given two different places to live. The officer[s] saw a misdemeanor committed in their presence, once they found out he was not licensed.

The trial court then referenced Tennessee Code Annotated § 40-7-118, the 'cite and release' statute, which generally requires an officer to issue a citation for a misdemeanor offense; however, under some circumstances, an officer may arrest an individual. The trial court found the following extenuating circumstances in this case warranting an arrest: when the driver cannot provide satisfactory evidence of identification; the prosecution might otherwise be jeopardized; or there is a reasonable likelihood the person may fail to appear. See Tenn. Code. Ann. § 40-7-118(c)(3), (4), (5). The trial court reasoned, "[The Defendant] had given the wrong state where he lived. He had stated Michigan, or where he was from as Michigan."

Alternatively, the trial court determined that, even if the encounter rose to the level of an investigatory stop under Terry v. Ohio, 342 U.S. 1 (1968), based on the totality of the circumstances, the stop was proper. The trial court ruled on the issue as follows:

[T]he officers had information in that area of the convenience store . . . that dope deals were going down in that area. Very similar to Terry.

-6-

The officers could stop a person temporarily to see what they're doing there. "What's your business here?"

I think in <u>Terry</u> wasn't it outside a — in a high crime area and it was late at night or something like that?

And the officer goes up and tells, "Who are you?"

Now, in the <u>Terry</u> case, of course, it went on to a frisk, [be]cause the . . . U.S. Supreme Court indicated it was of the public interest, great public interest make sure the officers approached don't get shot, so they can do a frisk for weapons only. Not for evidence, but for weapons.

. . . .

So assume it was a <u>Terry</u> stop. That means you can go up and talk to somebody. I guess I could go up and talk to somebody. "Will you talk to me?" I guess any citizen in the United States could, as long as it wasn't a breach of the peace, harassment, or stalking, or something like that.

And asked — just a simple question, "Have you got any identification?"

Defendant says, "No, but I'm from Michigan." Under Terry, upon suspicion that any person may be armed . . .

The trial court then read excerpts from the cases of <u>Katz v. United States</u>, 389 U.S. 347 (1967), and <u>Terry v. Ohio</u>. After reading, the trial court continued:

Under the totality of the circumstances, the officers' actions at this Sunoco gas station, I think the police acted properly and reasonably. It was not an unreasonable stop. I guess it could be argued that maybe once he got him stopped . . .

But it was no more than going up to say, "Have you got any identification?" you know, or something of that nature.

Even if it turned into a <u>Terry v. Ohio</u> stop, which I'm not even convinced we got a <u>Terry v. Ohio</u> stop, and even if the Defendant could prevail that he was prevented by leaving a short period of time by the officer, then it would be — still be permissible under <u>Terry v. Ohio</u>.

The initial question posited for this court is whether the officer was justified in approaching this Defendant and asking for some sort of identification or his driver's license after the Defendant agreed to speak with the officer. Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). However, these constitutional principles do not limit all contact between the police and private citizens. Instead, "these constitutional protections are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). As such, courts have recognized three different types of police-citizen interactions: "1) a full scale arrest which must be supported by probable cause; 2) a brief investigatory stop which must be supported by reasonable suspicion; and 3) a brief police-citizen encounter which requires no objective justification." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

It is only "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16. It has repeatedly been held that "even when police have no basis for suspecting that an individual has committed or is about to commit a crime, the officer may approach an individual in a public place and ask questions without implicating constitutional protections." Daniel, 12 S.W.3d at 425. To that end, "courts have consistently held that the Fourth Amendment is not implicated and no seizure occurs when police approach an individual, in a public place, or in a parked car" and ask the individual questions or request to search, "so long as police do not convey a message that compliance with their request is required." Id. at 426. The rule has been further explained as follows:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

Id. at 425 (citing Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion); see also Florida v. Bostick, 501 U.S. 429, 434 (1991); INS v. Delgado, 466 U.S. 210, 216-17 (1984); Brown v. Texas, 443 U.S. 47, 50-53 (1979); State v. Moore, 776 S.W.2d 933, 938 (Tenn. 1989)).

Accordingly, a "seizure" implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. See Bostick, 501 U.S. at 437. To determine whether a police encounter amounts to a seizure, courts consider all of the circumstances surrounding the encounter and determine whether the conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Id. at 434-35; see also Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). Some of the factors which are relevant and should be considered by courts when applying this totality of the circumstances test include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen. See generally Michigan v. Chesternut, 486 U.S. 567, 575 (1998); United States v. Mendenhall, 446 U.S. 544, 554 (1980); Wayne R. LaFave, Search and Seizure, § 5.1(a).

Under this analysis, police-citizen encounters do not become "seizures" simply because citizens may feel an inherent social pressure to cooperate with police. Daniel, 12 S.W.3d at 425. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Delgado, 466 U.S. at 216. Courts have typically held that an encounter becomes a "seizure" if an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter. Daniel, 12 S.W.3d at 425 (citing LaFave § 9.3(a) (collecting cases)).

In Daniel, our supreme court cited with approval the case of State v. Butler, 795 S.W.2d 680, 685 (Tenn. Crim. App. 1990); a case which is factually similar to the circumstances presented here. There, defendants Butler and Riggins were parked in the lot of a video store for several hours. The proprietor of the store became suspicious and had a friend call the police. Several officers arrived at the scene, one of whom approached the driver's side of the car, which was occupied by Riggins. The officer asked for Riggins's

driver's license; Riggins replied that he did not have a license or any other form of identification. After checking the vehicle's registration, the officer told defendant Butler, who did have a license, to move the car. As Butler opened the door and began to get out of the passenger's side, the officer observed a gun in the rear floorboard. Both defendants were arrested for carrying a firearm and, thereafter, linked to an earlier burglary. Butler, 795 S.W.2d at 684.

Like the Defendant in this case, the defendants in Butler argued that the trial court should have suppressed the evidence as the product of an unlawful stop and seizure. After stating the rule that police officers may legitimately approach a vehicle in a public place, this court said, in part, as follows:

> The officer only detained Riggins when she learned that he was not in possession of a valid driver's license. Because a person must have a driver's license in his possession when operating a vehicle, the officer acted within her authority by refusing to let Riggins drive the vehicle away.
>
> From then until the point of arrest, the officers' conduct was reasonable. When the officer discovered that Butler had a valid operator's license, he was given permission to drive the vehicle off the lot. When the police saw a pistol within Butler's reach, they had a reasonable basis to search the car's passenger compartment.
>
> Because the officers had probable cause to arrest both defendants for possession of a weapon with intent to go armed, the search of the passenger compartment may also be upheld as a search incident to arrest.

Id. at 685 (internal citations omitted).

Butler controls this case. The officers observed the Defendant drive his vehicle into the Sunoco parking lot, park, exit, and go inside the gas station. After exiting the gas station, Sgt. Crawford, dressed in plain clothes, approached the Defendant, identified himself as a police officer, and asked to speak with the Defendant. Sgt. Crawford testified that the Defendant agreed to speak with him. At the suppression hearing, Sgt. Crawford stated that, initially, the Defendant was free to leave and was not blocked in any way from walking away. During the ensuing conversation, Sgt. Crawford asked the Defendant where he lived, and the Defendant replied that he lived in Michigan. Sgt. Crawford then asked the Defendant if had any identification, but the Defendant was unable to produce any, including a valid driver's license. The Defendant gave Sgt. Crawford his personal information and informed Sgt.

Crawford that he had lost his driver's license. Sgt. Crawford attempted to confirm through dispatch whether the Defendant had a valid license.

In Butler, we held that "an officer may legitimately approach a vehicle parked n a public place and make a request for identification of the driver." 795 S.W.2d at 685. In this case, the officers had actually seen the Defendant driving the vehicle before walking up to him in a public place and requesting identification. The Defendant consented to speak with Sgt. Crawford, and upon questioning, he could not provide a valid driver's license. As relied upon by the State in their argument, Tennessee Code Annotated section 55-50-351(a) provides, in pertinent part, as follows:

> Every licensee shall have such licensee's license in immediate possession at all times when operating a motor vehicle and shall display it upon demand of any officer or agent of the department or any police officer of the state, county or municipality. . . . [A]ny other law enforcement officer . . . . has the right to demand the exhibition of the license of any operator of a motor-driven cycle as described in § 55-8-101, and effect the arrest of any person so found to be in violation of this section.

Tenn. Code Ann. § 55-50-351(a) (emphasis added). Sgt. Crawford acted within his authority to detain the Defendant when the Defendant could not produce a driver's license upon demand in an effort to determine the status of that license. At the motion to suppress hearing, Sgt. Crawford confirmed that after the Defendant could not produce a valid driver's license, he was no longer free to leave and was placed in handcuffs when he began acting "nervous" and "fidgety." Sgt. Crawford thereafter determined that the Defendant's license was suspended and properly arrested him for that violation.[4] After the officer's lawful

---

[4] Probable cause to arrest need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006). Additionally, probable cause need only exist for some criminal offense; it does not matter that an officer believed he was arresting a suspect for a different offense. Knight v. Jacobson, 300 F.3d 1272, 1275 n.2 (11th Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002) ("[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." (citation omitted)). See also United States v. Lester, 647 F.2d 869, 873 (8th Cir. 1981) (holding that the "the validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrest"); LaFave § 1.4(d) (observing that the exclusion of evidence solely due to an officer's mistaken statement of the grounds for an arrest is unjustified "because such situations are often attributable to complicated legal distinctions between offenses or an officer's failure to record all the bases or the strongest basis upon which the arrest was made"); cf. Royer, 460 U.S. at 507 (observing that "the fact
(continued...)

approach and subsequent lawful detention of the Defendant to determine the status of his license, the events which unfolded gave rise to probable cause for the Defendant's arrest for driving on a suspended license. Butler, 795 S.W.2d at 685; see also State v. Ronnie Harrison Gibbs, No. 03C01-9404-CR-001, 1995 WL 455941, at *5 (Tenn. Crim. App. Aug. 2, 1995).

Sgt. Crawford approached the Defendant in a public place after seeing the Defendant drive a vehicle, requested a driver's license after the Defendant agreed to speak with him, and thereafter detained the Defendant when he could not produce one. This Sgt. Crawford could legitimately do, notwithstanding the fact that the officers were motivated by their desire to investigate a possible drug transaction. See Butler, 795 S.W.2d at 685; State v. Smith, 787 S.W.2d 34, 35 (Tenn. Crim. App. 1989) ("Even though the officer was primarily motivated by the radio report, if his actions were reasonable on other grounds, even if the reasons are not articulated by the officer, the stop would be legal."). The drugs discovered following the Defendant's lawful arrest were properly admitted at his subsequent trial. The Defendant's suppression issue is without merit.

*II. Sufficiency of the Evidence*

The Defendant has challenged the sufficiency of the evidence supporting his conviction for possession of .5 grams or more of cocaine with intent to sell or deliver within 1000 feet of a school zone. Specifically, he argues that the State failed to prove that the offense occurred in a school zone. According to the Defendant, "The [S]tate's evidence as to the distance from the school property to the point of arrest was . . . insufficient as established by the testimony of Jake White regarding the manner of calculation of that distance." The Defendant lodges no complaint to the other elements of the offense nor to his other convictions. The State responds that the evidence established that the gas station where the Defendant was arrested was located within 1000 feet of Tri-Cities Christian Elementary School.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in

---

[4](...continued)
that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying [defendant's] custody by proving probable cause").

testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[, . . . and i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in [a d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). Furthermore, "[a] violation of subsection (a) . . . is a Class B felony if the amount involved is point five (.5) grams or more of any substance congaing cocaine . . . ." Tenn. Code Ann. § 39-17-417(c)(1). Additionally, where the State establishes that the violation of subsection 417 "occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school," the defendant is subjected to a higher offense classification, a greater fine, and a minimum mandatory sentence. See Tenn. Code Ann. § 39-17-432.

In this case, as proof that the sale occurred in a drug-free school zone, the State presented the testimony of Pat Yelton, the administrator of Tri-Cities Christian Schools. She testified that she had worked for Tri-Cities Christian Schools for thirty-four years and was familiar with the various school campuses. Ms. Yelton testified that, on October 30, 2007, Tri-Cities Christian School was operating a private elementary school in the Lynn Garden area of Kingsport. She reviewed the map of the area that had been prepared for trial and agreed that it showed the proper location of the school. Ms. Yelton confirmed that Tri-Cities Christian School owned all of the property surrounding the building and that at no time was

-13-

any part of the property leased to a third party. However, according to Ms. Yelton, Tri-Cities Christian School did not own "the field across the road" from the school, but they did use the field "for the physical fitness or educational part of [their] program."

The State also presented the testimony of Jake White, who had been employed for over fourteen years with the City of Kingsport in the Geographic Information Systems Department ("GIS"). In this case, Mr. White created a map of the area using aerial photographs and property line data from the GIS Department's database. On this map, the Tri-Cities Christian Elementary School's property was outlined in red, which included "a track or an athletic field of some sort," and the 1,000 feet "buffer" was shaded in blue.[5] According to Mr. White, "[t]ypically the property boundary lines come from the property assessor's officer," and they also used "address information" maintained by the GIS Department. Mr. White explained, "once the property's boundary identified," the computer system "generate[s] a buffer so many feet or miles or any distance from the identified piece of property." Based upon his calculations, Mr. White opined that, on October 30, 2007, the Sunoco gas station was within 1000 feet of Tri-Cities Christian Elementary School's property.

Additionally, Officer Summey verified the accuracy of the map, confirming street names and the location of the gas station and the school on the map. Sgt. Crawford testified that signs to the school were visible from Lynn Garden Drive. In fact, Sgt. Crawford stated that the school itself could be seen from Lynn Garden Drive.

The Defendant's sole argument is that the State did not prove that the offense occurred within 1000 feet of school property. He challenges Mr. White's "manner of calculation." The Defendant noted that Mr. White testified that the map included the football field, which Ms. Yelton stated was not school property. He further asserted that the records of the county property assessor had not been reviewed and verified for accuracy and that "[n]o independent calculation of the one-thousand (1,000) foot protected zone had been calculated."

Here, Mr. White created the map using the GIS Department's database and aerial photographs. He testified that the offense took place within 1000 feet of Tri-Cities Christian Elementary School. We cannot review the specifics of the map because it is not included in the record on appeal. There is no indication from the record before this court that inclusion of the field played any significant role in Mr. White's calculation. Mr. White was thoroughly

---

[5] The large aerial map was retained by the trial court clerk's office and not transmitted to this court on appeal due to the "bulky" nature of the exhibit. Apparently, the large aerial map was a "photograph of the relevant area upon which were superimposed property lines and color coding indicating the property comprising the school and the one thousand foot (1,000) area radiating from that property."

-14-

cross-examined about the information he utilized in preparing the map. Moreover, Ms. Yelton testified as to the accuracy of the map, and Sgt. Crawford said that the school and school signs were visible from Lynn Garden Drive. The jury was allowed to use common sense in evaluating the information and witness's testimony in determining whether the gas station was within 1000 feet of the buffer area of the school. See State v. Calvin Eugene Bryant, Jr., No. M2009-01718-CCA-R3-CD, 2010 WL 432487, at *11-13 (Tenn. Crim. App. Nov. 1, 2010), perm. app. denied, (Tenn. Apr. 13, 2011); see also State v. Lindsey, 208 S.W.3d 432, 444 (Tenn. Crim. App. 2006); State v. Greg Harris, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, at *8-9 (Tenn. Crim. App. Feb. 23, 2005). We conclude that the evidence was sufficient to establish that the offense occurred within 1000 feet of school property.

### III. Sanctions for Failure to Preserve Evidence

The Defendant asserts that the trial court erred by denying his request for sanctions against the State for failure to preserve the identity of the individual seen with the Defendant at the Sunoco gas station. Specifically, the Defendant contends the trial court should have issued the instruction outlined in State v. Ferguson, 2 S.W.3d 912 (Tenn. 2010). Often times throughout the Defendant's brief, he refers to the white male as the "missing witness" and notes that he "moved for the 'missing witness' rule" at trial. Moreover, in the conclusion section of his brief, he cites to Tennessee Pattern Jury Instructions—Criminal 42.16, which deals with an absent material witness. The State responds that the trial court properly denied the Defendant's request for sanctions because the Defendant failed to show that the State had lost or destroyed the evidence.

During the discussion of preliminary matters prior to voir dire, the prosecutor stated that, in addition to the motion to suppress hearing, "some other hearings" had been conducted. The trial court replied, "That issue, we had a Ferguson issue. . . . My mind has slipped on me since that . . . issue first came up. I notice [defense counsel], this morning, had filed a request for a . . . Ferguson charge as in TPI."[6] The prosecutor relayed the Defendant's issue, "It concerns a situation in which [defense counsel] had asked the State to provide him with the name of the white male that Officer Steve Summey had brief contact with along the lines of a missing witness type charge." The prosecutor then referenced a supreme court opinion, stating that the opinion outlined what the trial court "must find before a missing

---

[6] The Defendant's request for such an instruction is not included in the record on appeal. However, the trial court used the word "filed," indicating a written request. Moreover, following the trial court's ultimate ruling on the issue, the trial court confirmed with defense counsel that a written motion requesting the instruction had been filed.

witness charge can be given." The trial court then inquired if the missing witness had been identified. The prosecutor then, seemingly, summarized the facts from the prior hearing[7]:

> Officer Summey has previously testified and would testify, if need be, that he spoke to this gentlemen briefly; got his name at that time; asked for consent to search him; searched him and found him to be in possession of money, but no drugs; and immediately released him and concentrated on [the Defendant].
>
> He never ran a warrants check on this individual, never wrote down this individual's name, does not know this individual, and has no way of being able to recall who this individual is.
>
> And we brought up at the hearing last Wednesday or Thursday, our position would be that if anybody knows who this person might be it would be [the Defendant], since it's our contention [the Defendant] was meeting him up there for the purposes of a transaction. It was apparent to the officers that they knew one another.

The trial court then referenced Tennessee Pattern Jury Instructions—Criminal 42.23, dealing with the State's duty to preserve evidence taken from Ferguson. The trial court later noted, "That's a missing witness issue there. . . . Ferguson is a different animal, I believe." The parties agreed to defer the matter until later.

Following the initial charge to the jury, the trial court asked, "When [are] we going to have to address this Ferguson issue?" The prosecutor said, "I think at charge time," and defense counsel agreed. The trial court explained, "Now, here the charge is set out in the TPI. Even though you've given me a suggested charge, if I give the charge, I'll give Charge 42.23." Addressing the steps outlined in Ferguson "that a trial judge must take in deciding whether or not this charge should be given," the trial court noted that "it looks like the State's relying upon circumstantial evidence on the money this other fellow had, so I would have to consider that[.]" Later, the trial court discussed that one of the factors to be considered was "the relative strength of the case." The parties indicated that the issue would be dealt with following the presentation of further proof.

---

[7] In a footnote, the State argues for waiver of this issue because no copy of a transcript of this previous hearing is included in the appellate record. However, because the majority of the argument and proof on the issue was developed at trial and because the trial court made its ruling on the issue at trial, and those events being transcribed, we deem the record sufficient for our review of the issue.

When court reconvened the following morning, the prosecutor provided the court with a copy of an opinion from this court, State v. Timothy Dewayne Williams, No. W2008-02730-CCA-R3-CD, 2010 WL 1172206 (Tenn. Crim. App. Mar. 26, 2010), perm. app. denied, (Tenn. Sept. 2, 2010), arguing that the case was "factually on point as what we have here." Both the prosecutor and defense counsel argued the applicability of the Williams case to the present case. The prosecutor relied upon the Williams opinion for the proposition that Ferguson only applied to the loss or destruction of exculpatory evidence, not to the failure to interview a witness. Defense counsel responded that the officers in this case did in fact interview the witness but failed to retain any identifying information. The trial court confirmed with counsel that they wanted to address the matter later.

Finally, following the conclusion of the State's proof, the trial court heard more argument on the Ferguson issue and made a ruling. Defense counsel confirmed that there was no evidence of any intentional wrongdoing on the part of the State in failing to maintain the witness's information. Addressing the exculpatory nature of the unidentified witness's testimony, defense counsel argued that he was the only other person who could testify about the circumstances leading up to the Defendant's arrest. Defense counsel argued that, based upon his conversations with the Defendant, he believed that the unidentified witness would deny any eye contact with the Defendant or that any communication occurred inside the store. Defense counsel also asserted that this unidentified witness would have evidence relevant to "whether this was a consensual stop [of the Defendant] or if something was said that would show that . . . [the Defendant] was in fact under the control of the State." The prosecutor, again citing to the Williams case, responded that the officers did not destroy or hide exculpatory evidence, but they simply "failed to interview a witness who was available to the [D]efendant for interview." The prosecutor further argued that the witness had no apparent exculpatory value, and it was the State's contention that the Defendant possessed this individual's contact information, having arranged to meet with this person at the gas station. Defense counsel responded that the officers did interview the witness but failed to preserve his information, placing the Defendant in the position of either having to testify on his own behalf, or not testify and "take the chance and go ahead without any supporting witness."

Addressing the Ferguson factors, the trial court determined that there was no showing of intentional wrongdoing, at most the State was negligent in failing to preserve the information. Next, the trial court considered the significance of the destroyed evidence and concluded that the "exculpatory nature of the evidence" was "very tenuous" because there "[r]eally was not much suggestion what this witness would offer, outside the fact he's missing and cannot be identified." Moreover, the trial court observed that the officers searched this individual and did not finding anything incriminating; therefore, they had no further cause to detain him. The trial court also looked at the other evidence used to support

-17-

the convictions, noting that the Defendant had confessed to the crime, giving a "[s]hort, concise, clear statement after advice of <u>Miranda</u>"; that the Defendant had a large amount of cocaine, wrapped in individual packages; that one "rock" was placed in his hat and the others were found inside his buttocks, indicating that an exchange was to occur; and that the officers testified that they observed suspicious activity.

The trial court then referenced another opinion of this court, <u>State v. Joseph B. Thompson</u>, No. E2002-00061-CCA-R3-CD, 2003 WL 1202979 (Tenn. Crim. App. Mar. 17, 2003), <u>perm. app. denied</u>, (Tenn. June 30, 2003), stating that the case was "almost directly [on] point." The trial court noted the similar facts of that opinion to this case:

> In that case the police officers were called to a robbery of a . . . micro hotel [sic] on Stone Drive in Kingsport, Sullivan County, Tennessee. The officers went in. There were several people gathering around. The clerk of the hotel had been severely injured. Some males in the group . . .

> It was a crime that drew a crowd, in other words. There were various other people. And somebody made the comment there, "Jojo didn't do that." It was developed at trial that Joseph B. Thompson was known as "Jojo." The police didn't obtain that information as to the address or name of the person that made this comment. In fact [the trial court] continued the case on various occasions to give the defense attempt to locate him [sic]. The police didn't write down the name.

> Now, the way it went up on appeal, it's almost directly on point, the "Jojo" Thompson is, except that they emphasized <u>Brady</u>, and . . . the appellate court panel did not discuss <u>Ferguson</u>, but they did discuss <u>Brady</u>, basically finding there was no <u>Brady</u> violation by the police not obtaining that information and name of the witness.

Regarding the <u>Williams</u> case previously discussed by the parties, the trial court noted some disagreement with that case that "this could not apply to failure to obtain a name." The trial court continued, "But under the circumstances of this case I find there's no error."

In conclusion, the trial court determined that it would not impose any sanctions on the State, declining to issue a <u>Ferguson</u> instruction. On appeal, the Defendant alleges that the trial court's ruling on this issue was in error.

First, we feel constrained to note that throughout these proceedings, the <u>Ferguson</u> issue and the "missing witness" rule are often referred to interchangeably. They are not the same thing. The "missing witness rule" as recognized in Tennessee provides that

> a party may comment about an absent witness when the evidence shows 'that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial.

<u>State v. Bough</u>, 152 S.W.3d 453, 463 (Tenn. 2004) (quoting <u>Delk v. State</u>, 590 S.W.2d 435, 440 (Tenn. 1979)). "The missing witness rule is premised on the idea that the absent witness, 'if produced, would have made an intelligent statement about what was observed.'" <u>Dickey v. McCord</u>, 63 S.W.3d 714, 722 (Tenn. Ct. App. 2001) (quoting <u>State v. Francis</u>, 669 S.W.2d 85, 89 (Tenn. 1984)).

The "missing witness" or "absent material witness" instruction provides:

> When it is within the power of the [S]tate or the defendant to produce a witness who possesses peculiar knowledge concerning facts essential to that party's contentions and who is available to one side at the exclusion of the other, and the party to whom the witness is available fails to call such witness, an inference arises that the testimony of such witness would have been unfavorable to the side that should have called or produced such witness. Whether there was such a witness and whether such an inference has arisen is for you to decide and if so, you are to determine what weight it shall be given.
>
> [This inference does not apply to the defendant because [he][she] has a lawful right not to testify and [his][her] failure to testify cannot be considered for any purpose against [him][her], nor can any inference be drawn from such fact.]

7 Tennessee Practice, Tennessee Pattern Jury Instructions—Criminal 42.16 (footnotes omitted). Before the instruction may be given, the party requesting it must establish "that 'the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial.'" <u>State v. Bigbee</u>, 885 S.W.2d 797, 804 (Tenn. 1994) (quoting <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 334-35 (1992)) (internal citation and quotation marks omitted). To justify a missing witness instruction, "the witness who was not called must not have been equally available to both parties." <u>See State</u>

v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992) (citing State v. Overton, 644 S.W.2d 416, 417-18 (Tenn. Crim. App. 1982); Bolin v. State, 472 S.W.2d 232, 235 (Tenn. Crim. App. 1971)); State v. Eldridge, 749 S.W.2d 756, 758 (Tenn. Crim. App. 1988).

Although the Defendant cites to the "missing witness" instruction, Tennessee Pattern Jury Instructions—Criminal 42.16, in his brief and states that he "moved for the 'missing witness' rule," it is clear from our review of the transcript that the Defendant requested the instruction outlined in Ferguson, Tennessee Pattern Jury Instructions—Criminal 42.23. Briefly, we observe that it was precisely because this witness was not available to either party at the time of trial and because the Defendant believed the witness's testimony would be favorable to the defense, that he sought sanctions against the State for failing to preserve this evidence. The "missing witness" rule was inapplicable to the present case. Moreover, even without the instruction, we note that in closing arguments, defense counsel was able to argue the effect of this individual's absence to the jury. We decline to address this rule any further.

We turn to the issue at hand, the refusal of the trial court to issue a Ferguson instruction in its charge to the jury. The Defendant claims that the trial court erred in failing to instruct the jury on the lost identity of this individual seen with the Defendant at the gas station. The State disagrees, arguing that the Defendant failed to show that the State lost or destroyed evidence.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[8] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In the case of Ferguson, 2 S.W.3d at 916, our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence deprived a defendant of a fair trial. The initial analytical step in this test for determining whether there was any duty to preserve evidence was described as follows:

---

[8] "As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." Ferguson, 2 S.W.3d at 914 n.3 (citing Betts v. Brady, 316 U.S. 455, 462 (1942); Watkins v. State, 393 S.W.2d 141, 144 (Tenn. 1965); Lofton v. State, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)).

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)). The court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." Id. Accordingly, those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." Id. at 917.

If the trial court determines that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges or craft such orders as may be appropriate to protect the defendant's right to a fair trial. Id. The court provided that, "[a]s an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction." Id. The Ferguson instruction provides:

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Id. at 917 n.11; see also 7 Tennessee Practice, Tennessee Pattern Jury Instructions—Criminal 42.23 (footnote omitted).

We apply an abuse of discretion standard to the review of a trial court's decision under Ferguson. See State v. Angela M. Merriman, No. M2011-01682-CCA-R3-CD, 2012 WL 524474, at *1-2 (Tenn. Crim. App. Feb. 17, 2012), perm. app. granted, (Tenn. June 21, 2012). At the outset, we agree with the Defendant that this case is distinguishable from Williams because here the officers did interview the witness but failed to maintain this witness's identifying information. Nevertheless, the initial analytical step outlined by the Ferguson court incorporates a Brady analysis. See Ferguson, 2 S.W.3d at 917 n.9.

The Thompson case cited by the trial court, involving the allegation of a Brady violation, spoke to the delayed disclosure of evidence in addition to the officer's failure to obtain the witness's identifying information. See 2003 WL 1202979, at *13. In that case, the facts were as follows:

> Officer Osterman, who arrived at the Microtel shortly after Sergeant Brookshire, testified that it was his duty to make sure that no one entered the crime scene while the police were conducting the investigation. He stated that he otherwise took no significant part in the actual investigation of the case. While standing near the lobby area of the motel, Officer Osterman noticed four white males standing near the hallway. He heard one of the men say "the only black man I know is 'Jo-Jo' and it wasn't 'Jo-Jo.'" At the time Officer Osterman heard the statement, he had not been informed that the defendant was a suspect. Some twenty months later, Officer Osterman, during an interview by the assistant district attorney, for the first time recalled his knowledge of the conversation. The state immediately informed the defendant of the statement and the trial court granted a six-month continuance so that the defendant could investigate its origin.

Id. On appeal, this court held that the record did "not establish that the inability to locate the witness was the result of the delayed disclosure." Id. In concluding that no Brady violation had been established, this court reasoned, "Officer Osterman was unable to provide a description, other than the fact that he was white, making it unlikely that an earlier disclosure would have assisted the defendant in identifying the individual." Id.

Here, the trial court made the following findings regarding Officer Summey's interview of the second individual at the gas station:

> He was identified and talked to. I don't think it's been—come out directly what was said at the time that they talked, but the officer that was interviewing the unidentified white male did take his name. There's no indication it was written down, but he took his name. And I think that's been admitted to. And

the white unidentified male was released from any further detention or stop. His name is unknown at this time. It was unknown prior to trial.

The attorney was—was informed of the . . . unidentified white male, but the State could not force—or could not fin[d] any information as to the name, location, address, tag number, driver's license number, or anything of that nature. So the unidentified white male is lost.

The record reveals that Officer Summey did interview the witness and obtained some identifying information; however, the record is devoid of any evidence that the officer memorialized this information in writing or otherwise. Officer Summey was unable to provide any information about this individual from his memory. Nevertheless, this case is factually distinguishable from Thompson where the officer in that case was not the investigating officer and only overheard a witness present at the scene. Here, the officers were investigating a suspected drug deal when they separated the two individuals to ask questions of them. Not only was this unidentified white male interviewed, but evidence obtained during the search of this man was used against the Defendant at trial. Moreover, based upon the facts as they developed, this individual could have likewise been charged as a participant in the attempted deal at the gas station. Clearly, the identity of this individual was material to the defense.[9] Accordingly, the State had a duty to preserve the evidence, and a violation of Brady did occur.

Nonetheless, the remaining factors of Ferguson do not provide the Defendant with relief. The trial court found that the State was at most negligent, there being no evidence of any intentional wrongdoing; that the lost or destroyed evidence was of minimal significance; and that the evidence adduced was sufficient to support the Defendant's convictions. The trial court observed that the officers searched this individual and did not find anything incriminating; therefore, they had no further cause to detain him. The trial court also looked at the other evidence used to support the convictions, noting the Defendant confessed; the Defendant had a large amount of individually-wrapped cocaine packages; the location of the cocaine packages on the Defendant's person; and the officers' testimony of suspicious activity. Thus, even though we conclude that the State failed in its duty to preserve evidence, we cannot say that the trial court abused its discretion by denying the Defendant's request for a Ferguson instruction.

_____

[9] In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985).

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE